# In the United States Court of Federal Claims

BID PROTEST
Nos. 17-452C & 17-455C (Consolidated)
(Filed Under Seal: June 30, 2017 | Reissued: July 24, 2017)*

|  |  |
|---|---|
| XPO LOGISTICS WORLDWIDE GOVERNMENT SERVICES, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| THE UNITED STATES OF AMERICA, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| CROWLEY LOGISTICS, INC., | ) ) |
| Defendant-Intervenor. | ) ) ) |

Keywords: Bid Protest; 28 U.S.C. § 1491;
Corrective Action; Past Performance;
Unbalanced Pricing; Best-Value
Determination; Waiver; IDIQ Contract;
Total Evaluated Price.

*Frederick W. Claybrook, Jr.*, Claybrook LLC, Washington, DC, for Plaintiff. *Daniel R. Forman*, *Mark A. Ries*, *James G. Peyster*, and *Charles Baek*, Crowell & Moring LLP, Washington, DC, Of Counsel.

*Christopher L. Harlow*, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, for Defendant, with whom were *Patricia M. McCarthy*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General. *Robert D. Bowers*, *Willie J. McAlister*, and *Peter B. Ries*, Attorney-Advisors, Offices of the Staff Judge Advocate, United States Transportation Command, and *Michael G. McCormack*, Trial Attorney, Air Force Legal Operations Agency, United States Air Force, Of Counsel.

*Kara M. Sacilotto*, Wiley Rein LLP, Washington, DC, for Defendant-Intervenor. *Rand L. Allen*, *Brian G. Walsh*, *Gary S. Ward*, and *Cara L. Lasley*, Wiley Rein LLP, Washington, DC, Of Counsel.

---

* This Opinion was originally issued under seal on June 30, 2017, and the parties were given the opportunity to request redactions. In light of the suggested redactions, the opinion is now reissued, with redactions of potentially sensitive information indicated by brackets.

**OPINION AND ORDER**

**KAPLAN, Judge.**

These consolidated bid protests arise out of a solicitation for a contract to provide transportation services issued by the Department of Defense, through the United States Transportation Command (USTRANSCOM or "the agency"). The protests were filed after the agency decided to take certain corrective action recommended by the Government Accountability Office (GAO), in response to a bid protest filed there by XPO Logistics Worldwide Government Services, LLC (XPO). GAO had recommended that USTRANSCOM reconsider its award of the contract to Crowley Logistics, Inc. (Crowley) because of what GAO considered a flawed analysis of Crowley's past performance references.

After the agency announced that it intended to follow GAO's recommendation by re-evaluating both offerors' past performance references and issuing a new source selection decision, both XPO and Crowley filed bid protests with this Court. In its protest, XPO alleges that the corrective action the agency has elected to take on the basis of GAO's recommendation is not broad enough because it does not address other errors the agency allegedly committed in its award determination. Crowley claims, on the other hand, that the agency's decision to take corrective action is unreasonable because GAO's conclusion that the original award decision was flawed was itself arbitrary and capricious.

Currently before the Court are the parties' cross-motions for judgment on the administrative record with respect to both protests, as well as the government's motion to dismiss Crowley's complaint. For the reasons set forth below, the government's motion to dismiss is **DENIED**. XPO's motion for judgment on the administrative record in case number 17-452 is **DENIED**, and the government's and Crowley's cross-motions are **GRANTED**. In case number 17-455, Crowley's motion for judgment on the administrative record is **DENIED**, and the government's and XPO's cross-motions are **GRANTED**.

**BACKGROUND**

**I.      The Solicitation**

USTRANSCOM "is a unified, functional combatant command which provides support to the eight other US combatant commands, the military services, defense agencies, and other government organizations." Admin. R. (AR) Tab 6 at 151. On March 25, 2015, it issued solicitation number HTC711-15-R-R003 (RFP or "the Solicitation") seeking proposals for an indefinite-delivery, indefinite-quantity contract to provide services throughout the continental United States as well as in Alaska and Canada in connection with the Department of Defense Freight Transportation Services (DFTS) program. Id. at 87, 150. These "transportation coordination services" would be provided to both the Defense Logistics Agency and the Defense Contract Management Agency, "from receipt of the shipment request through final payment for services rendered," including "management of shipments" and "[t]ransportation support." Id. at 151–52. Additionally, USTRANSCOM noted that "[o]ther government agencies [could] require these services over the course of the contract." Id. at 152. The DFTS contract would be for a two-year base period with five one-year options. Id. at 89–96.

## A.      The Solicitation's Instructions

In the Solicitation's instructions, USTRANSCOM directed offerors to submit their proposals in five volumes, covering the following topics: 1) Corporate Experience; 2) Business Proposal; 3) Technical Capability; 4) Past Performance; and 5) Price. Id. Tab 20 at 9485.[1] The parties' disputes in these bid protests relate primarily to the agency's evaluation of the past performance and price volumes.

For the past performance volume, USTRANSCOM instructed offerors that they were to "provide past performance information for all contracts/efforts submitted in RFP Attachment 11," a form which was also used to document "corporate experience." Id. at 9492. Attachment 11 was to contain all of an offeror's "most relevant contracts and/or efforts within the past three (3) years." Id. at 9485. For each contract, offerors were to explain how their performance related to the tasks required by the DFTS program in "scope, magnitude, and complexity." Id. at 9485–86. Offerors were also instructed to request that each of the parties with whom they had contracted complete past performance questionnaires and return them to USTRANSCOM for evaluation. Id.

With respect to pricing, the Solicitation set forth contract line items (CLINs) for the different transportation services that the contractor might be required to perform. Id. at 9451–61. The primary CLIN category was CLIN X001, the line item for transportation services for each year of the contract. See id. The agency instructed offerors that they were to "provide individual transportation rates [for this CLIN] in Attachment 2 – Rate Table." E.g., id. at 9451. Attachment 2, in turn, consisted of multiple rate tables containing tens of thousands of sub-CLINs (SLINs), which were each based upon the geographical origin and destination of a shipment, the equipment type required for a shipment, and the weight of the shipment, as well as the required timeframe for delivery. See id. at 10101–08; see also id. Tabs 20A–20B (pricing sheet attachments).

## B.      Evaluation Criteria

The Solicitation provided that in determining the contract award, "[e]xpanded tradeoff procedures [would] be utilized in accordance with FAR 15.101-1 and DoD Source Selection Procedures." Id. Tab 20 at 9494. USTRANSCOM intended to award the contract to the offeror who was "deemed responsible," whose proposal "conform[ed] to all required terms and conditions" of the Solicitation, and whose proposal "represent[ed the] best value to the Government, price and other factors considered." Id. In addition, the Solicitation provided that the agency would "not pay a price premium that it consider[ed] to be disproportionate to the benefits associated with the proposed margin of service superiority." Id.

Pursuant to the terms of the Solicitation, the agency would separately evaluate each proposal volume. See id. Offerors' corporate experience and business proposal submissions

---

[1] This citation and the Court's subsequent citations for the Solicitation are to the "conformed" version following USTRANSCOM's issuance of thirteen amendments to the Solicitation. AR Tab 20. According to the administrative record's table of contents, the conformed version was issued July 9, 2015.

would be rated on an acceptable/unacceptable basis. Id. Technical capability would be rated based on certain subfactors, using a tiered adjectival rating scale. See id. at 9496–501. As discussed in more detail below, past performance was to be evaluated to determine its recency and relevancy and to assess performance confidence, with adjectival ratings assigned to the latter two factors. Id. at 9501–02. Technical capability was more important than past performance, and "[a]ll rated evaluation factors (Technical Capability and Past Performance), when combined, [were] approximately equal to price." Id. at 9494.

For past performance, the agency stated that it would "determine the recency and the relevancy of each past performance effort being evaluated." Id. at 9501 (emphasis in original). Further, the Solicitation contained a chart setting forth the standards that would determine the degree of relevancy that the agency would assign to each past performance effort:

| RATING | DESCRIPTION |
|---|---|
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

Id.

The RFP provided that after the agency "determined the recency and relevancy of each past performance effort," it would assign an "overall Past Performance Confidence Assessment rating[] . . . to each offeror." Id. (emphasis in original). The Confidence Assessment ratings were, in descending order: substantial confidence (i.e., a "high expectation that the offeror will successfully perform the required effort"); satisfactory confidence ("a reasonable expectation that the offeror will successfully perform the required effort"); limited confidence ("a low expectation that the offeror will successfully perform the required effort"); and no confidence ("no expectation that the offeror will be able to successfully perform the required effort"). Id. at 9501–02.[2]

With respect to the price volume, the Solicitation provided that "[p]rice [would] be considered in determining the best value offeror" and that it would "be evaluated for completeness and reasonableness." Id. at 9502. Specifically, USTRANSCOM would evaluate each offeror's "proposed pricing . . . using one or more of the techniques set forth in FAR 15.404-1(b)(2) to determine [whether] prices [are] fair and reasonable." Id. "In addition," the agency advised, "a Total Evaluated Price (TEP) [would] be calculated by totaling the extended prices for all proposed pricing of CLIN X001 (Transportation) in the Rate Tables (Attachments

---

[2] The Solicitation also provided a neutral rating of "unknown confidence" where "the offeror's performance record [was] so sparse that no meaningful confidence assessment rating [could] be reasonably assigned." AR Tab 20 at 9502.

2A and 2B).” Id.[3] The TEP included both the base years and option years in its calculation. See id. An offeror's TEP would thus “reflect[] the proposed transportation costs of CLIN X001 for all anticipated performance periods . . . based on projected annual escalations.” Id. Finally, the Solicitation provided that “the TEP [would] be considered in making the contract award decision.” Id.

## II.    The First Contract Award

USTRANSCOM received four offers in response to the Solicitation, including proposals from both Crowley and XPO's predecessor, Menlo Worldwide Government Services, LLC. Id. Tab 57 at 11054.[4] On December 22, 2015, the Source Selection Authority (SSA) determined that “GENCO Infrastructure Solutions, Inc. represent[ed] the best overall value to the Government.” Id. at 11060. He explained that GENCO's proposal had “the most favorable overall technical approach, provide[d] the second lowest overall risk . . . , and the second highest past performance confidence assessment rating.” Id. at 11059. He further noted that “GENCO offered the second lowest TEP” and that, although Crowley's TEP was lower, Crowley “had an Unknown past performance confidence assessment rating.” Id. The SSA also concluded that “[t]he benefits associated with [] GENCO's proposed margin of service superiority merit[] the associated price premium,” and that Crowley's lower TEP was “not necessarily advantageous . . . considering the unknown risk the offeror will be unable to perform this effort” and “the lower technical rating . . . and higher technical risk rating under the Operational Support subfactor.” Id.

On December 30, 2015, the government awarded the contract to GENCO. Id. Tab 58 at 11061.

## III.    The First GAO Protest

After the agency awarded the contract to GENCO, both XPO and Crowley filed bid protests with GAO. See id. Tabs 67, 74. XPO withdrew its protest before GAO acted on it. Id. Tab 72 at 11941–42. Crowley pursued its protest, contending, among other things, that the discussions that the agency held with it were not meaningful because the agency did not raise certain concerns that it harbored regarding alleged performance risks in Crowley's proposal. Id. Tab 74 at 11950.

On April 19, 2016, GAO sustained Crowley's protest. Id. at 11946. It recommended that USTRANSCOM “reopen the competition, conduct meaningful discussions with the competitive

---

[3] The “extended” prices were calculated by multiplying the offeror's proposed unit price for each line item by the agency's estimated quantity for that item. See AR Tab 20 at 10101; see also id. Tabs 20A–B.

[4] During the course of the competition, Menlo's parent company was purchased by XPO Logistics, Inc., the parent company of Plaintiff XPO. AR Tab 126 at 12576 n.1. As a result, beginning with the GAO protest in December 2016, Menlo began referring to itself as XPO, see id., and the Court will use XPO to refer to the Menlo/XPO offeror throughout this opinion.

range offerors, request and evaluate revised proposals, and make a new source selection." See id. at 11957.

## IV.     Corrective Action Based on the First GAO Decision

USTRANSCOM followed GAO's recommendation. It reopened discussions with all offerors in the competitive range and informed offerors that they could submit proposal revisions, which the agency would evaluate and use as the basis for a new award decision. See id. Tab 88 at 11982. In the meantime, GENCO, the previous awardee, withdrew from the competition. Id. Tab 86 at 11980. As a result, only Crowley and XPO remained in the competitive range, and both submitted revised proposals on June 15, 2016. See id. Tab 116 at 12273; see also id. Tab 120 at 12442–43.

### A.     The Agency's Revised Price Evaluation

Upon receipt of the offerors' revised price proposals, USTRANSCOM's contracting officer (CO) prepared a price evaluation report. See id. Tab 116 at 12273, 12319. In it, the CO noted that, in accordance with the Solicitation, he had calculated each offeror's TEP by using the extended prices the offerors had submitted for each proposed SLIN under CLIN X001. Id. at 12273. He stated that "[w]here available, the historical volume was utilized as a multiplier to the rate provided by the Offeror across all lanes by all three tiers." Id. "Where historical volumes were unknown," however, "a volume of either four (two for Tier 1, one for Tier 2, and one for Tier 3) for truckload shipments or a volume of the minimum weight within weight band limits for LTL and TD (e.g. a weight of 4001 pounds is used for a weight band between 4001-5000 pounds) [was] used as the multiplier." Id.

The CO explained that the TEP calculation method "was developed to ensure that all potential lanes for use under the requirement would be evaluated and [that] the likelihood of unbalanced pricing would be diminished versus a scenario-based evaluation method." Id. at 12274. A "scenario-based evaluation would be problematic," he noted, because "use of historically used lanes would not be representative of the new acquisition as lanes change frequently as there is much fluctuation in shipments." Id. "This [was] evident in the Independent Government Cost Estimate," he observed, "as it was based on historical spend of customers, and potential customers, versus historical by lane spending."[5] Id.

The CO then set out his analyses of the prices that both Crowley and XPO had submitted in their initial proposals and in each of their proposal revisions. See id. In doing these analyses, he utilized FAR 15.404-1(b)(2)(i), which entailed "[c]omparison of proposed prices received in response to the solicitation." Id. Noting that the prices of the previous awardee, GENCO, had

---

[5] The agency's independent government cost estimate (IGCE) used historical data from a similar predecessor program as part of its calculations, and included the possibility of additional military services opting into the contract during later years. See AR Tab 3 at 29. USTRANSCOM estimated a total contract value, including all option years, of $2,656,233,390.80. Id. at 31. Subsequently, the agency set a contract maximum of $3,000,000,000 in the RFP. Id. Tab 20 at 9461.

been "determined fair and reasonable," the CO compared both Crowley's and XPO's proposed prices to GENCO's and to one another's. Id. at 12275. Doing so, he asserted, "assisted in providing a solidified average unit rate and standard deviation." Id. Further, the CO compared the offerors' prices at both the total SLIN level and at the individual unit price level to "detect[] . . . possible unbalanced pricing." Id. Where a unit price, average unit price, or total SLIN price was higher than the average price plus one standard deviation, the CO rated the price "high." Id. If any of those were two standard deviations or more above the average, the price was rated "significantly high." Id.

The CO first noted that based "on the initial pricing submitted by both offerors after re-opening discussions, it was determined necessary to send each Offeror Evaluation Notices (ENs) to address rates identified as high or significantly high." Id. at 12302. But based on Crowley's revisions and certain cost and pricing data it submitted, the CO found that Crowley's "revised price changes give[] the Government confidence that Crowley presently has a clear understanding of the requirement." Id. at 12305. As a result, he concluded that "all of Crowley's rates can be determined fair and reasonable based on adequate price competition and Other Than Certified Cost or Pricing Data." AR Tab 116 at 12305. Similarly, after XPO responded to its EN, the CO determined that XPO's prices were "fair and reasonable based on adequate price competition." Id. at 12308.[6]

The CO then calculated each offeror's final TEP. Id. at 12314–15. Crowley's TEP was $7,116,365,688, while XPO's was $7,741,505,204. Id. XPO's TEP was thus 4.1% higher than the average, while Crowley's was 4.3% lower than the average. Id.[7] The CO observed that following final proposal revisions, Crowley had "13,412 individual rates" which were "considered high," representing "2.85% of the total number of unit prices." Id. at 12319. XPO had 5,672 unit prices which were considered high, representing 1.2% of the total number of unit prices. Id. The CO concluded that "all unit prices and TEPs are determined fair and reasonable based on adequate price competition and there remains no indication of unbalanced pricing." Id.

## B.   Crowley's Past Performance Evaluation

On November 8, 2016, the agency's Past Performance Evaluation Team (PPET) prepared an addendum to the agency's previous evaluation of Crowley's past performance, based upon revisions made during the reopened competition. Id. Tab 119 at 12407, 12441. The addendum included a narrative about each of Crowley's past performance references for which USTRANSCOM received a past performance questionnaire. Id. at 12408–22.

---

[6] Both Crowley and XPO made slight revisions to their prices in their final proposal revisions. See AR Tab 116 at 12309, 12311. This did not alter the CO's conclusions regarding the reasonableness of either offeror's pricing. See id. at 12309–14.

[7] Although not repeated in this final TEP analysis, when the CO calculated the offerors' TEPs prior to final proposal revisions, he observed that the "differences in TEPs were "large in terms of actual dollars," but that "the relative dispersion of the TEPs indicates competitive proposals." AR Tab 116 at 12274, 12309.

The narratives followed a standard format. Each one began with a quotation regarding the type and number of services or transactions encompassed by the contract, drawn from the past performance questionnaire. E.g., id. at 12408. The narratives then set forth the agency's determination whether the particular reference was "recent" and identified the total value of the contract. Id. Next, each narrative included quotations from the questionnaire regarding the quality of Crowley's past performance, an adjectival quality rating assigned by the commercial entity, and a statement whether the respondent would award a contract to Crowley in the future. Id.

Finally, each narrative concluded with a standard sentence that assigned an adjectival relevancy rating to the reference discussed. Id. Sixteen of the narratives concluded that the reference "was determined Somewhat Relevant as the effort involved some of the scope and magnitude of effort and complexities as this solicitation requires." Id. at 12408–36. The remaining narratives concluded with a sentence stating that the reference "was determined Not Relevant as the effort involved little of the scope and magnitude of effort and complexities as this solicitation requires." See id.

The PPET next assigned a confidence assessment rating to Crowley based on Crowley's sixteen "Somewhat Relevant" references. Id. at 12440–41. It noted that it had considered all of these references because they showed "that the Offeror has successfully performed transportation coordination services to include transportation support and management of shipments via ground, specialized equipment, air freight, and time-definite service level shipments." Id. at 12440. The PPET also explained that:

> The Somewhat Relevant references were rated individually; more, when all of the Somewhat Relevant references were considered together, they reflect that the Offeror has successfully performed transportation and coordination services via ground, specialized equipment, air freight, and time-definite service level which include some of the scope and magnitude of effort and complexities this solicitation requires.

Id. at 12441.

The PPET concluded that:

> In terms of scope and complexity, the Somewhat Relevant references combined are similar to the Defense Freight Transportation Services (DFTS) requirement. In terms of magnitude, the Somewhat Relevant references pertaining to specialized equipment, air freight, and time-definite service level combined are similar to the DFTS requirement. Although, the Somewhat Relevant references pertaining to ground truckload and less-than-truck transportation combined are not as similar to the DFTS requirement in terms of magnitude, the experience is sufficient to provide the Government confidence the Offeror can perform those types of services.

Id. Accordingly, the agency assigned Crowley a rating of Satisfactory Confidence based on its "reasonable expectation that the Offeror [would] successfully perform the required effort." Id.

### C.     The Source Selection Evaluation Board Report

On November 7, 2016, the Source Selection Evaluation Board (SSEB) issued its report, which included an evaluation of the revisions submitted by XPO and Crowley during the reopened competition. See id. Tab 117 at 12383–85.

The SSEB reaffirmed the Substantial Confidence assessment rating it had assigned to XPO in its initial report. Id. at 12388. In that report, the SSEB had concluded that XPO had thirty-three past performance references that were either somewhat relevant, relevant, or very relevant. Id. Tab 55 at 11027. The SSEB rated these references from marginal to exceptional in terms of quality. Id. XPO's Substantial Confidence rating was based on the agency's "high expectation that the Offeror [would] successfully perform the required effort." Id.

With respect to Crowley's past performance, the SSEB stated that:

> In establishing the overall confidence assessment rating for Crowley, the Government gave more consideration to the references considered Somewhat Relevant as they reflect the Offeror has successfully performed transportation coordination services to include transportation support and management of shipments via ground, specialized equipment, air freight, and time-definite service level shipments within a single contract.

Id. Tab 117 at 12387.

The SSEB further stated that "when all of the Somewhat Relevant references are considered together, they reflect that the Offeror has successfully performed transportation and coordination services via ground, specialized equipment, air freight, and time-definite service level as required in this solicitation." Id. It observed that all of Crowley's somewhat relevant past performance references rated Crowley's performance as exceptional or very good. Id. Accordingly, it concurred in the PPET's Satisfactory Confidence rating, based upon "a reasonable expectation that the Offeror will successfully perform the required effort." Id.

The SSEB also agreed with the CO's conclusions that both offerors' price proposals were "fair and reasonable based on competition." Id. at 12390. Additionally, it noted that XPO's "past performance confidence assessment rating [was] more favorable than Crowley's rating," but that "Crowley's [TEP was] more favorable than [XPO's]." Id. at 12395–96.

### D.     The Source Selection Advisory Council Comparative Analysis

On November 8, 2016, the Source Selection Advisory Council (SSAC) prepared an updated comparative analysis. Id. Tab 118. It reviewed the "underlying evaluation documents" and "concur[red] with [their] findings." Id. at 12398. The SSAC also "verified [that] the SSEB's evaluation followed the solicitation evaluation criteria and that the ratings were consistently applied." Id. It then prepared the following table presenting the final evaluation results:

| Offeror | Business Proposal - Proposal Compliance/ SB Sub Plan | Technical Subfactor 1 – Information Technology /Risk | Technical Subfactor 2 – Implementation /Risk | Technical Subfactor 3- Carrier Management /Risk | Technical Subfactor 4 – Operational Support /Risk | Past Performance | Total Evaluated Price (TEP) |
|---|---|---|---|---|---|---|---|
| Crowley | Acceptable/ Acceptable | Good/ Low | Good/ Moderate | Good/ Low | Good/ Low | Satisfactory Confidence | $7,116,365,688 |
| Menlo | Acceptable/ Acceptable | Good/ Low | Good/ Low | Good/ Low | Good/ Low | Substantial Confidence | $7,741,505,204 |

Id.

The SSAC also performed a comparative analysis and integrated assessment of the two proposals. Id. at 12399–405. It used the evaluation factors and subfactors set out in the Solicitation and discussed the specific strengths of each proposal within each technical subfactor. E.g., id. at 12400 (noting that for the IT/management subfactor, Crowley's "first strength was for a proposed 24/7 support line and tools which will facilitate timely resolution of customer inquiries and issues" and "exceed[ed] the PWS requirement"). The SSAC concluded that for subfactor one, there was "no discernible difference in the risk or quality of the proposed technical approaches." Id. at 12401. For subfactor two, the SSAC stated that "[w]hile both Offerors' approaches contain multiple strengths with benefits, [XPO's] approach is considered more favorable in that the Offeror provides an implementation plan utilizing a transportation management system that is currently in use by the Government and requires minimal revisions to conform to the DFTS requirement." Id. at 12402. With respect to the third subfactor, the SSAC noted that "Crowley's approach is considered more favorable in that the Offeror is proposing to use [***]." Id. at 12403–04. Finally, for the fourth subfactor, the SSAC reported that there was no discernible difference between XPO and Crowley's proposals. Id. at 12404.

The SSAC did not discuss past performance other than to note that XPO's Substantial Confidence rating was higher and thus more favorable than Crowley's Satisfactory Confidence rating. Id. at 12405. It then wrote the following with respect to its overall tradeoff recommendation:

> It is our recommendation that the cost difference of approximately $625M, or 8.4%, is disproportionate to the benefit associated with [XPO's] lower risk rating in Subfactor 2 and more favorable past performance rating. Although Crowley has a higher risk rating in Subfactor 2, the risk associated with Implementation is not enough to offset the price difference. It is recognized that [XPO's] past performance assessment rating of Substantial Confidence is higher than Crowley's assessment rating of Satisfactory Confidence; however, the Government has a reasonable expectation Crowley will successfully perform the required effort. The Government will not pay a price premium that it considers disproportionate to the benefits associated with the proposed margin of service superiority, and overall, it is our recommendation that it is not beneficial to pay a price premium for [XPO's] better past performance rating of

Substantial Confidence or Low Risk rating for the subfactor of Implementation.

Id. The SSAC concluded that "Crowley's proposal [was] the best value to the Government." Id. at 12398.

## V.   The New Source Selection Decision and Contract Award

On November 9, 2016, the SSA authored a new Source Selection Decision Document, in which he set forth his determination that Crowley's proposal "provides the best overall value to satisfy the Government's requirement." Id. Tab 120 at 12442. He based his decision on his "integrated assessment of proposals submitted in response to the solicitation," the SSEB and SSAC reports (with which he explicitly concurred), and "the capabilities of the Offerors to successfully fulfill the Government's requirement." Id. at 12442, 12444.

On November 22, 2016, the agency awarded the contract to Crowley. Id. Tabs 121–122.

## VI.   GAO's Second Decision

On December 5, 2016, XPO filed a protest with GAO. Id. Tab 126. It asserted that USTRANSCOM's award to Crowley should be set aside because 1) the agency's evaluation of XPO's proposal "under the technical capability factor was unreasonable and contrary to the RFP"; 2) the agency "unreasonably assigned Crowley a 'Low' technical risk rating under subfactor 1" of the technical evaluation; and 3) the agency's "best value analysis was unreasonable and incomplete." Id. at 12577–96. On January 19, 2017, XPO supplemented its protest with two additional grounds, asserting that USTRANSCOM "conducted an unreasonable assessment of unbalanced pricing in the Crowley price proposal" and that its "evaluation of Crowley's past performance violated the evaluation criteria." Id. Tab 139 at 12831, 12833.

On March 14, 2017, GAO issued a decision sustaining in part and dismissing in part XPO's protest. Id. Tab 148 at 13003–04. GAO noted that the record provided "no basis on which to sustain [XPO's] protest" as to the agency's evaluation of XPO's own proposal. Id. at 13008 n.8. Further, GAO found untimely XPO's allegations that Crowley's prices were materially unbalanced. Id. at 13008. XPO had argued before GAO (as it does here) that Crowley's prices for the [***] SLINs were understated, while its prices for the [***] SLINs were overstated. Id. at 13009. GAO observed that the premise of XPO's unbalanced pricing argument was that the quantity estimates the government used in the Solicitation were not reasonably accurate and that those estimates "led to a situation where offerors could 'game' the solicitation's pricing structure by proposing unbalanced pricing." Id. at 13010. GAO thus found the argument untimely because "the estimates and the way they were to be applied in the price evaluation were evident from the solicitation" such that XPO waived any argument regarding their accuracy by not raising it prior to submitting a proposal. Id.

On the other hand, GAO sustained XPO's allegations as to USTRANSCOM's evaluation of Crowley's past performance. Id. at 13008. XPO had contended that "Crowley's past efforts were substantially smaller in magnitude than the effort required under the solicitation," noting that each of the sixteen Crowley references that the agency characterized as somewhat relevant were "miniscule" in dollar value when measured as a percentage of the total DFTS contract

value of $3 billion. Id. at 13011. In response, the agency argued that GAO should instead look at the "average annual value" of each performance reference and compare that value to "the maximum value for the transportation CLIN for the 2-year base period of the contract awarded to Crowley," which was $105 million. Id. at 13012.

GAO, however, rejected the agency's arguments for two reasons. First, GAO found that "it [was] not clear from the contemporaneous record how the agency determined that the magnitude of Crowley's past efforts supported the ratings of somewhat relevant." Id. at 13013–14. GAO noted that the agency's past performance evaluation report identified only "the number of monthly shipping transactions, the period of performance, and an approximate total value" "for most of the past efforts at issue." Id. at 13014. GAO found no evidence that the agency had in fact "calculated an average annual value for the efforts in order to make an 'apples-to-apples' comparison of the efforts' magnitude relative to the magnitude of the solicitation." Id. Moreover, according to GAO, there was "nothing in Crowley's past performance evaluation report to reflect what benchmarks might have been used to assess whether Crowley's past efforts met the criteria for the various relevancy ratings defined in the solicitation." Id.

Second, and in any event, GAO concluded that "the agency's selection of only the relatively low-value base period of the contract as awarded to Crowley unreasonably distort[ed] the comparison of the magnitude of Crowley's past efforts to the magnitude of the solicitation." Id. It agreed that "where the period of performance of an offeror's past effort materially differs from the period of performance in a solicitation, some method of making an 'apples-to-apples' comparison of the magnitude of the two efforts is necessary." Id. But it rejected the argument that the agency only consider the two-year base period, rather than the value of the entire contract. See id. GAO noted that the IGCE and the value of Crowley's contract as awarded both showed that "the value of each option year [was] significantly higher than the value of the base period." Id. at 13015. It concluded that because the record reflected that the agency itself "anticipated the value of the option years to be significantly higher than the value of the base period" and included option year pricing in calculating offerors' TEPs, using "the significantly lower-valued transportation CLIN for the base period . . . [was] an unreasonable benchmark for assessing the relevance of the magnitude of Crowley's past efforts." Id.

Based on this conclusion, GAO recommended "that the agency reevaluate Crowley's past performance in a manner that is reasonable and consistent with both the solicitation and [its] decision, and then make a new source selection determination." Id. at 13017. "Alternatively," GAO recommended, "if the agency determines that the solicitation's evaluation criteria do not reasonably reflect its needs . . . the agency [should] amend the solicitation, engage in discussion with offerors, and request revised proposals." Id.[8]

---

[8] GAO stated that "[b]ecause a new best-value determination [was] necessary to implement [its] recommendation . . . [it would] not address XPO's allegations regarding the best-value tradeoff analysis." AR Tab 148 at 13017.

## VII.  This Action

On March 23, 2017, the CO announced that the agency was "taking corrective action in accord with the GAO decision dated March 14, 2017." Id. Tab 176 at 15860. Six days later, on March 29, 2017, XPO filed a complaint in this court (No. 17-452), which was followed later in the day by a complaint filed by Crowley (No. 17-455). On March 30, 2017, the Court granted XPO's and Crowley's motions to intervene in the other's protest. Orders, ECF Nos. 11, 21. The Court also consolidated the cases, designating XPO's protest as the lead case. See Order, ECF No. 14. On April 10, 2017, XPO filed an amended complaint. ECF No. 28.

XPO's amended complaint includes five counts: 1) that USTRANSCOM's unbalanced pricing evaluation failed to comply with the FAR and that the agency unreasonably concluded that Crowley's pricing was not unbalanced, Am. Compl. ¶¶ 71–74; 2) that the agency's corrective action plan is "arbitrary, capricious, and unlawful in scope" because "it fails to remediate a violation of law" by failing to address Crowley's unbalanced pricing, id. ¶¶ 80–81; 3) that the agency performed an unreasonable best value assessment because it relied exclusively on the TEPs in evaluating offerors' price proposals, id. ¶¶ 86–88; 4) that the agency failed to appropriately document its best value tradeoff decision and relied upon adjectival ratings alone, id. ¶¶ 91–99; and 5) that the agency engaged in misleading discussions by altering its interpretation of best value and how it conducted the price evaluation, id. ¶¶ 103–07.

Crowley asserts one cause of action in its complaint. See Crowley Compl. at 17–20. It alleges that the agency's decision to take any corrective action at all is arbitrary and capricious because the underlying GAO decision is itself arbitrary and capricious. Id. ¶¶ 58–62.

On April 24, 2017, both XPO and Crowley moved for judgment on the administrative record in their respective protests. ECF Nos. 37, 39. On May 8, 2017, the government filed a cross-motion for judgment on the administrative record with respect to each protest, and also moved to dismiss Crowley's protest for lack of jurisdiction. ECF No. 41. Both XPO and Crowley cross-moved for judgment on the administrative record in the other's protest. ECF Nos. 42–43. The Court held oral argument on all pending motions on June 2, 2017. See Order, ECF No. 27.

## DISCUSSION

## I.  Subject Matter Jurisdiction

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 § 12, 28 U.S.C. § 1491(b). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

A.    **Standing**

To possess standing to bring a bid protest, a plaintiff must be an "interested party"—i.e., an actual or prospective bidder (or offeror) who possesses a direct economic interest in the procurement. Sys. Application & Techs., Inc., 691 F.3d at 1382 (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). An offeror has a direct economic interest if it suffered a competitive injury or prejudice as a result of an alleged error in the procurement process. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing"); see also Weeks Marine, Inc., 575 F.3d at 1359.

In post-award protests, like this one, a plaintiff may demonstrate competitive injury or prejudice by showing that it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process." Weeks Marine, Inc., 575 F.3d at 1359–62 (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). In making the standing determination, the Court assumes well-pled allegations of error in the complaint to be true. Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. 309, 323 (2015) (citing Digitalis Educ. Sols., Inc. v. United States, 97 Fed. Cl. 89, 94 (2011), aff'd, 664 F.3d 1380 (Fed. Cir. 2012)); see also Salmon Spawning & Recovery All. v. U.S. Customs & Border Prot., 550 F.3d 1121, 1131–32 & n.9 (Fed. Cir. 2008) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694–95 (2010) (noting that the showing of prejudice as an element of standing "turns entirely on the impact that the alleged procurement errors had on a plaintiff's prospects for award, taking the allegations as true," and distinguishing "allegational prejudice" required to establish standing from the "prejudicial error" required to prevail on the merits).

Both XPO and Crowley have standing to pursue the claims alleged in their complaints. XPO, an actual offeror, alleges that the agency should have rejected Crowley's offer because its pricing was materially unbalanced. Am. Compl. ¶¶ 71–73. It also challenges the agency's reliance upon each offer's TEP in making an award decision, alleging that the agency should have instead considered the actual cost to the government of each offer, and that, if it had done so, XPO would have had a price advantage over Crowley. Id. ¶¶ 86–88. Considering that XPO and Crowley were the only two offerors within the competitive range and that price played a significant role in the agency's decision to award the contract to Crowley over XPO, these allegations are sufficient to demonstrate that XPO had a substantial chance of securing the award absent the errors it alleges.

Crowley, the awardee, also has standing to press its claim that the agency should not have implemented the corrective action GAO recommended. Thus, absent that alleged error, the agency would not have set aside the award to Crowley. Therefore, taking its allegations as true for purposes of the standing inquiry, Crowley has clearly demonstrated the requisite competitive injury to be an interested party for purposes of the Court's bid protest jurisdiction.

Case 1:17-cv-00452-EDK   Document 58   Filed 07/24/17   Page 15 of 25

### B.      The Government's Motion to Dismiss

The government seeks dismissal of Crowley's protest on the grounds that it is moot or premature. Def.'s Partial Mot. to Dismiss, Cross-Mot. for J. on the Admin. R., & Opp'n to Pl.'s & Def.-Intervenor's Mots. for J. on the Admin. R. (Def.'s Mot.) at 14, ECF No. 41. These contentions lack merit. "In general, a claim must be dismissed as moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" Rothe Dev. Corp. v. Dep't of Def., 413 F.3d 1327, 1331 (Fed. Cir. 2005) (quoting City of Erie v. Pap's A.M., 529 U.S. 277, 287 (2000)). "A claim is not ripe for judicial review when it is contingent upon future events that may or may not occur." Sys. Application & Techs., Inc., 691 F.3d at 1383 (citing Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580–81 (1985)).

Crowley's claim is neither moot nor unripe. Crowley challenges the reasonableness of the agency's decision to reopen a competition that Crowley had already won. If the Court agreed with Crowley's arguments, then it might enjoin the agency from taking the challenged corrective action. Thus, the controversy is a live one in which Crowley has a cognizable interest. Further, Crowley's challenge to the agency's decision is ripe for review because it is not contingent on how the agency executes the corrective action, as the government claims. Def.'s Mot. at 15 (asserting that because Crowley challenges the "manner in which TRANSCOM may ultimately carry out corrective action that has not yet been completed," its challenge is not ripe for decision). The gravamen of Crowley's argument is that no corrective action at all should be taken.

Because Crowley is an interested party and its bid protest is neither moot nor unripe, the Court has subject matter jurisdiction. The government's motion to dismiss is therefore **DENIED**.

## II.     Standard of Review

Pursuant to Rule 52.1 of the Rules of the Court of Federal Claims (RCFC), the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

In a bid protest, the Court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351.

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). Thus, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))). Instead, the Court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action") A disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa Construzioni, 238 F.3d at 1338.

## III.   Crowley's Bid Protest

In its protest, Crowley attacks the agency's decision to take the corrective action GAO recommended by setting aside the contract award and reevaluating the offerors' past performance. As the court of appeals has observed, "a procurement agency's decision to follow the Comptroller General's recommendation, even though that recommendation differ[s] from the contracting officer's initial decision, [is] proper unless the Comptroller General's decision itself was irrational." Honeywell, Inc., 870 F.2d at 648; see also Centech Grp. v. United States, 554 F.3d 1029, 1039 (Fed. Cir. 2009). Thus, in reviewing an agency's implementation of corrective action recommended by GAO, the court's "task is to evaluate the rationality of the GAO decision." Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir. 2011). And in determining whether GAO's decision is rational, the court must necessarily consider the reasonableness of the underlying agency decision as to which GAO recommended corrective action. Sys. Application & Techs., Inc. v. United States, 100 Fed. Cl. 687, 714–15 (2011) (finding GAO recommendation for corrective action irrational where record showed agency performed proper analysis and tradeoff to which GAO did not give appropriate deference), aff'd, 691 F.3d 1374 (Fed. Cir. 2012).

In this case, Crowley contends that GAO's decision was irrational, arguing that "GAO's decision ignores the very thing it was charged with reviewing: the Agency's contemporaneous evaluation record." Crowley Logistics, Inc.'s Mem. in Supp. of Its Mot. for J. on the Admin. R. at 16, ECF No. 39-1. According to Crowley, that "contemporaneous record provides a rational, documented basis for the Agency's determination to assign Crowley a Satisfactory Confidence rating." Id. at 15. It claims that instead of reviewing the agency's reasoning and deferring to the agency's methodology, GAO imposed upon the agency its own "new, unwritten dollar-value benchmark to be used in evaluating whether each offeror's past performance references met even the lowest rating of Somewhat Relevant." Id. at 14. According to Crowley, "[b]y imposing its own dollar-value threshold in the context of evaluating Past Performance, GAO fundamentally altered the Solicitation's tailored evaluation criteria and created the false appearance that

Crowley—which indisputably has the transport and logistics experience to perform this Contract—apparently lacked any so-called 'relevant' performance history." Id. at 20.

Crowley's arguments are based on a misapprehension of GAO's reasoning and decision. GAO did not ignore the record developed by the agency regarding Crowley's past performance; rather, it found that the record did not reflect the basis for the agency's decision to rate sixteen of Crowley's past performance references "Somewhat Relevant." GAO concluded that the agency's past performance evaluation was unsupported by the record because "it [was] not clear . . . how the agency determined that the magnitude of Crowley's past efforts supported the ratings." AR Tab 148 at 13013–14. Specifically, there was "nothing in Crowley's past performance evaluation report to reflect what benchmarks might have been used to assess whether Crowley's past efforts met the criteria for the various relevancy ratings defined in the solicitation." Id. And the absence of any stated explanation was particularly problematic to GAO given the relatively low dollar value of Crowley's efforts when compared to the value of the DFTS contract. Id. at 13013.

GAO's criticisms were well-taken. Although the discussion of Crowley's past performance references was thirty-five pages long (as Crowley emphasizes), the narratives for each of the past performance references set forth in those thirty-five pages simply restate information contained in the performance questionnaires and then end with a conclusory characterization of the relevance of the reference. The narratives do not include any discussion that compares the scope and magnitude of effort and complexities of the offeror's past performance references to those of the DFTS contract. To be sure, an agency's past performance analysis does not need to contain "an exhaustive comparison" of a reference's relevance to the performance work statement. See Westech Int'l, Inc. v. United States, 79 Fed. Cl. 272, 294 (2007). Nonetheless, an agency must supply enough detail to allow the reviewing body to ensure that the agency action "evinc[es] rational reasoning and [the] consideration of relevant factors." See Weeks Marine, Inc., 575 F.3d at 1369 (internal quotation omitted). It was not unreasonable for GAO to find the level of detail inadequate in this case, particularly in light of the fact that the dollar value of each of the past performance references was relatively low as compared to the value of the DFTS contract.

Moreover, GAO reasonably rejected agency counsel's attempt to supply an explanation of the agency's methodology during the protest. Counsel argued that the agency's "Somewhat Relevant" ratings were reasonable because the "aggregate of the average annual value" of twelve of Crowley's past performance references exceeded "the maximum value for the transportation CLIN for the 2-year base period of the contract awarded to Crowley." AR Tab 148 at 13012.

First, GAO observed that the rationale counsel offered was "not reflected in the contemporaneous record." Id. at 13012; see also id. at 13014 ("[T]here is no evidence that the agency calculated an average annual value for the efforts in order to make an 'apples-to-apples' comparison of the efforts' magnitude relative to the magnitude of the solicitation.").

Second, even if the record had supported the proffered rationale, GAO reasonably found the rationale itself fatally flawed because it used only the contract's two-year base period for purposes of comparing an offeror's past performance efforts to the effort required by the Solicitation and did not include the efforts required during the option years. See id. at 13014–15. By contrast, the IGCE encompassed the entire possible period of performance including the

option years. Id. at 13015. Similarly, the calculation of TEP (which was to be considered in making the award decision) also included the option years. Id. Further, each option year was expected to cost at least $50 million more than the entire two-year base period.[9] See id. Tab 4 at 57; see also id. Tab 148 at 13015. Accordingly, GAO found the "agency's selection of the significantly lower-valued transportation CLIN for the base period . . . to be an unreasonable benchmark." Id. Tab 148 at 13015.

The Court agrees with GAO that the agency's proffered methodology was unreasonable. Indeed, in determining relevance, the agency was required to compare an offeror's past performance efforts to the scope, magnitude, and complexity of efforts that "this solicitation requires." See id. Tab 20 at 9501. The Solicitation "requires" that offerors be able to undertake the efforts that are included in the option years. It was not irrational, therefore, for GAO to reject the methodology agency counsel suggested.[10]

Finally, contrary to Crowley's contentions, GAO did not alter the Solicitation's past performance evaluation methodology or set any bright-line benchmark that the agency must use upon reevaluation to determine whether a past performance reference is somewhat relevant. Rather, in explaining why it had rejected the agency's purported method of comparison, it stated that "[o]ne reasonable benchmark under the circumstances here could be the average value of each year of performance (including options) of the contract." Id. Tab 148 at 13016 (emphasis added). But it did not require the agency to use any particular benchmark. It merely recommended that "the agency reevaluate Crowley's past performance in a manner that is reasonable and consistent with both the solicitation and [its] decision." Id. at 13017. GAO's decision even noted the possibility of a different, non-monetary benchmark: "such benchmarks might have included . . . the number of total or monthly shipment transactions under the effort." Id. at 13014. USTRANSCOM is thus free, in its corrective action, to consider other aspects of a past performance reference either in addition to or, if appropriate, in lieu of dollar amount.

In short, because GAO's decision was rational, USTRANSCOM's decision to take corrective action in accordance with GAO's recommendation was reasonable. Crowley's motion for judgment on the administrative record in case number 17-455 is **DENIED** and the government's and XPO's cross-motions are **GRANTED**.

---

[9] As GAO noted, the option years were expected to cost more than the base period because of the "potential addition of military users of the contract." AR Tab 148 at 13015 (internal quotation omitted).

[10] In its reply memorandum, Crowley similarly suggests its own rationale for assigning a "Somewhat Relevant" rating to its past performance based upon factors in addition to dollar value, such as the kind of services, the volume and types of shipments, and the complexity of past performance efforts. Crowley Logistics, Inc.'s Reply to the Government's and XPO's Resps. & Resp. to the Government's and XPO's Cross-Mots. at 15–18, ECF No. 45. The Court does not consider whether Crowley's suggested methodology would provide a reasonable basis for a "Somewhat Relevant" rating, because the record is silent as to whether the agency relied on any of these factors.

IV.    **XPO's Bid Protest**

A.    <u>Unbalanced Pricing</u>

In Counts I and II of its amended complaint, XPO challenges the agency's unbalanced pricing evaluation and alleges that USTRANSCOM's corrective action is "arbitrary, capricious, and unlawful in scope" because it will not address the alleged flaws in that evaluation. Am. Compl. ¶¶ 71–73; 77–81. Specifically, XPO contends that "while claiming to have reviewed Crowley's proposal for unbalanced bidding, the agency somehow missed the fact that Crowley's evaluated price advantage was the product of Crowley low-balling the [***] subcontract line items ('SLINs'), especially those [***]." XPO's Br. in Supp. of Mot. for J. on the Admin. R. (XPO's Br.) at 2, ECF No. 37-1. It asserts that "[o]n the [***] SLINs [***], XPO was significantly lower in price, but this is not acknowledged or analyzed anywhere in the evaluation materials." <u>Id.</u> XPO further argues that "the agency was required to have eliminated Crowley's proposal for this reason alone." <u>Id.</u>

Citing <u>Blue & Gold Fleet, LP v. United States</u>, 492 F.3d 1308 (Fed. Cir. 2007), both the government and Crowley argue that XPO's unbalanced pricing claim has been waived because XPO did not file a protest challenging the accuracy of the Solicitation's quantity estimates before the time for responding to the Solicitation expired. In any event, they argue, XPO's unbalanced pricing argument lacks merit. For the reasons set forth below, the Court rejects the government and Crowley's contention that XPO waived its right to pursue its unbalanced pricing claims. It agrees, however, that XPO's argument fails on the merits.

FAR 15.404-1(g)(1) states that "[u]nbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more line items is significantly over or understated as indicated by the application of cost or price analysis techniques." FAR 15.404-1(g)(2), in turn, provides that "[a]ll offers with separately priced line items or subline items shall be analyzed to determine if the prices are unbalanced."

Mere mathematical imbalance, however, is not enough to justify the rejection of an offer; the imbalance must be material. <u>J&D Maint. & Servs. v. United States</u>, 45 Fed. Cl. 532, 536–37 (1999); <u>see also</u> Ralph C. Nash & John Cibinic, <u>Unbalanced Bids and Proposals: Trying to Beat the System</u>, 5 No. 4 Nash & Cibinic Rep. ¶ 21 (1991) ("It is <u>material</u> unbalancing which concerns the Government." (emphasis in original)). An imbalance is material "if a [CO] determines that the lack of balance poses an unacceptable risk to the Government," i.e., a risk that "award of the contract will result in paying unreasonably high prices for contract performance." FAR 15.404-1(g)(3), (g)(2)(ii); <u>see also</u> <u>Southgulf, Inc. v. United States</u>, 30 F. App'x 977, 978 (Fed. Cir. 2002) ("A bid is materially unbalanced when . . . there is a reasonable doubt that the bid will result in the lowest overall cost." (internal quotation omitted)); <u>Ultimate Concrete, LLC v. United States</u>, 127 Fed. Cl. 77, 83 (2016) (stating that materially unbalanced pricing exists when "significantly overstated or understated" prices give rise to a "reasonable doubt that the bid will . . . result in the lowest overall cost to the government").

In the context of an indefinite-delivery, indefinite-quantity (IDIQ) contract like the one awarded in this case, if the quantity estimates are accurate a mathematically unbalanced bid "poses little risk to the government." Daniel I. Gordon, <u>Unbalanced Bids</u>, 24 Pub. Cont. L.J. 1,

33–34 (1994). But by definition, because an "estimate" is only an approximation, an "accurate estimate" is merely an estimate that is based upon the best information reasonably available to the agency. See id. at 34. As a result, "where the agency, while confirming that the estimates are as accurate as possible, lacks complete confidence in their accuracy, the agency may reject the mathematically unbalanced bid because of 'reasonable doubt' that it will ultimately represent the low[est] cost to the Government." Id. "Rejection of the unbalanced bid is particularly justifiable where, in comparison with competing bids, its prices appear extremely skewed." Id.

As noted, GAO concluded (and both Crowley and the government argue) that XPO waived its unbalanced pricing claim by failing to challenge the reasonableness of the quantity estimates during the pre-offer stage of the competition. That conclusion was based on the premise that—in the context of an IDIQ contract—an unbalanced pricing claim will rise or fall based entirely on whether the quantity estimates in the solicitation are accurate, i.e., whether they are based on the best information available to the agency. But, as noted above, even when the estimates are as accurate as possible based on the information before the agency, it may still be appropriate to find a price proposal materially unbalanced where the prices that are proposed are so over- or understated that even a relatively small deviation from the agency's reasonable estimates gives rise to a risk that the agency will pay unreasonably high prices for contract performance. Further, even if the quantity estimates contained in the Solicitation are reasonably accurate, that does not relieve the agency of the obligation to undertake the unbalanced pricing analysis required by the FAR. Accordingly, the Court concludes that XPO is not precluded from pressing its unbalanced pricing claims because it did not file a protest challenging the reasonableness of the agency's quantity estimates before the time for submitting an offer expired.

While the Court rejects the government's and Crowley's waiver arguments, however, it is not persuaded of the merits of XPO's challenge. XPO argues that "USTRANSCOM violated procurement law by failing to abide by the terms of FAR § 15.404-1(g) during the evaluation of offerors' pricing proposals." XPO's Br. at 8. In particular, XPO argues that the agency's alleged failure to follow the required evaluation process resulted in its lack of consideration of whether there was a risk that the agency would pay unreasonably high prices for Crowley's services. See id. at 9–10. The record, however, reveals that these assertions are incorrect.

As noted above, FAR 15.404-1(g)(2) requires that "[a]ll offers with separately priced line items or subline items . . . be analyzed to determine if the prices are unbalanced." See FAR 15.404-1(g)(2). The regulations permit the CO to use either cost or price analysis techniques. The latter include the "[c]omparison of proposed prices received in response to the solicitation," as "[n]ormally, adequate price competition establishes a fair and reasonable price." Id. § 15.404-1(b)(2). This technique is one of the FAR's two "preferred" price analysis techniques. Id. § 15.404-1(b)(3). Only if this analysis reveals an unbalanced offer must the CO proceed to consider the risk to the government. Id. § 15.404-1(g)(2).

Here, the CO performed the preferred price analysis technique of comparing the "proposed prices received in response to the solicitation" in accordance with FAR 15.404-1(b)(2)(i). AR Tab 116 at 12274. He compared the individual unit prices and SLIN prices of both proposals with each other and with the prices in GENCO's previous proposal. Id. at 12275. Further, he used the unit price comparisons to create a standard deviation against which each price could be measured and assessed as high or significantly high. Id. The CO performed this

analysis for both XPO's and Crowley's prices each time they revised their price proposals. Id. at 12275–313. Thus, the record is quite clear that the CO complied with the price evaluation requirements of FAR 15.404-1(g), as he extensively compared the proposed prices received in response to the Solicitation.

Moreover, the CO used this analysis to draw conclusions about each offeror's proposed prices. He concluded that both Crowley's and XPO's prices were "fair and reasonable based on adequate price competition" (and on other than certified cost or pricing data with respect to Crowley). Id. at 12305, 12308. The CO further determined that "there remain[ed] no indication of unbalanced pricing." AR Tab 116 at 12319. In other words, the CO found that the offerors' prices were neither over- nor understated. This conclusion is adequately supported by the record. And, because the CO concluded there was no unbalanced pricing, FAR 15.404-1(g) did not require him to further consider any risk to the government from the offerors' prices. XPO's arguments thus lack merit. Accordingly, XPO's motion for judgment on the administrative record in case number 17-452, with respect to Counts I and II, must be **DENIED**, and the government's and Crowley's cross-motions must be **GRANTED**.

### B.     The Agency's Alleged Failure to Consider Likely Actual Cost

XPO contends that the agency violated the terms of the Solicitation by giving what it calls "exclusive, controlling weight in the best value tradeoff to the TEPs of the offerors." XPO's Br. at 18. It argues that the agency could not lawfully use TEP in this competition to determine cost differences between proposals because "the TEP numbers, at $7+ billion, were almost three times the IGCE of $2.7 billion and over three times the announced expected cost of $2.2 billion." Id. at 19. According to XPO, "[c]ommon sense tells one that it is irrational to rely on a 'cost difference' that does not comport with the actual cost to be paid." Id. It argues that "[t]o be meaningful, a best value determination must weigh the value of a proposal's non-price benefits against the cost to the government associated with those benefits." Id. (citations omitted, emphasis in original).

XPO's contentions are unavailing. In this case, the Solicitation explicitly provided that the agency would use TEP as the common basis for comparing relative costs. The relevant paragraph reads, in pertinent part, as follows:

> Price will be considered in determining the best value offeror. Price will be evaluated for completeness and reasonableness; however, price will not be rated. The Offeror's proposed pricing will be evaluated using one or more of the techniques set forth in FAR 15.404-1(b)(2) to determine [if] prices [are] fair and reasonable. Proposed pricing will also be evaluated to determine that all prices are complete . . . . In addition, a Total Evaluated Price (TEP) will be calculated by totaling the extended prices for all proposed pricing of CLIN X001 (Transportation) in the Rate Tables. . . . The TEP does not include the Not-To-Exceed costs for CLIN X002, Customs Brokerage. The TEP does not include the offeror's proposed pricing for CLINs 0003, Site Implementation and CLIN 0004, Systems Implementation. Both CLIN 0003 and 0004 will be evaluated to

> determine prices are fair and reasonable; however, they will not be
> included in the TEP. <u>The TEP will be considered in making the
> contract award decision</u>.

AR Tab 20 at 9502 (emphasis supplied).

The underscored text clearly conveys that it is the proposals' TEPs that "will be considered in making the contract award decision." There is no mention in the paragraph of "actual cost." Further, the Court is not persuaded by XPO's argument that the statement at the beginning of the passage that "[p]rice will be considered in determining the best value offeror" should be read to mean that the agency would also take into account some other measure of "actual cost to the government." In particular, contrary to XPO's arguments, the use of the phrase "in addition" at the beginning of the section that introduces the TEP as a relevant factor does not suggest that there is some distinction between "price" and "TEP" for purposes of the paragraph, or that "price" means actual cost. <u>See</u> XPO's Reply at 2, 19. The phrase "in addition" is used to transition from a discussion of how price would be evaluated for completeness, reasonableness, and fairness, to a discussion of how the agency would compare the proposals for purposes of making the contract award—i.e., through calculation and comparison of the TEPs. <u>See</u> AR Tab 20 at 9502.

Further, XPO's argument—that the agency was required by law to consider something other than TEP in making its best value determination in this case—essentially challenges the terms of the Solicitation itself, not an error made in the evaluation process. Because the argument was not made until after proposals were submitted and evaluated, it has been waived under <u>Blue & Gold Fleet</u>. <u>See</u> <u>Linc Gov't Servs., LLC</u>, 96 Fed. Cl. at 713 (finding that "plaintiff's challenges to the Army's price evaluation . . . amount to allegations of a patent error . . . in the Solicitation" and that "[h]aving failed to raise these objections . . . prior to submitting its proposal, plaintiff has waived its right to do so before this court").

In any event, XPO's argument that the agency was legally required to consider something beyond TEP fails on the merits. Thus, both 10 U.S.C. § 2305(a)(3)(A)(ii) and FAR 15.304(c)(1) recognize that agencies may consider either price <u>or</u> cost as an evaluation factor when making a source selection decision. Further, in the context of an IDIQ contract like the present one, "a comparative price evaluation of competing proposals presents a particular challenge" because the agency's needs are uncertain at the time of the solicitation. <u>Linc Gov't Servs.</u>, 96 Fed. Cl. at 713. Therefore "at the solicitation stage, the crucial decision confronting the procurement official turns on the relative prices of competing proposals, not the absolute cost that the government will pay for the procured goods or services." <u>Id.</u> at 714. The government may use any reasonable methodology that provides "a common basis for comparing the relative costs of the proposals." <u>Magnum Opus Techs., Inc. v. United States</u>, 94 Fed. Cl. 512, 535 (2010) (quoting <u>Aalco Forwarding, Inc.</u>, B–277241, 98–1 CPD ¶ 87, 1998 WL 121352, at *7 (Comp. Gen. March 11, 1998)). "The issue [i]s not whether the [government] could have selected a pricing methodology that (from plaintiffs' perspective) was better—the issue is whether the pricing methodology the [government] did select is arbitrary, capricious, or otherwise contrary to law." <u>Qwest Gov't Servs., Inc. v. United States</u>, 112 Fed. Cl. 24, 34 (2013) (quotation omitted, second and third alteration in original). Examining each offeror's TEP provides a common basis for comparing the costs of each offeror's proposal, and therefore was entirely reasonable.

Finally, there is no merit to XPO's argument that the agency engaged in misleading discussions with the offerors by failing to advise them of an alleged change in its method of evaluating price between its first and second evaluations. See XPO's Br. at 24. According to Count V of XPO's complaint, the agency had taken likely actual costs into consideration when it conducted its first evaluation, but during the second evaluation it changed its standards by relying only on TEP. Am. Compl. ¶¶ 105–06. It claims that "[h]ad the agency informed XPO of its changed interpretations, rather than informing XPO that it would follow the same procedures, XPO could have further improved its pricing relative to the TEP and likely would have been found to have offered the best value proposal." Id. ¶ 107.

XPO's argument that the agency considered something other than TEP to make its best value determination during the first evaluation lacks merit. It is based upon GAO's discussion of a statement by the CO asserting that the TEPs were "not indicative of what will truly be spent over the lifetime of the contract." AR Tab 74 at 11954 n.8 (quoting the CO's Statement). This statement was submitted as part of the agency's defense of its decision to award the contract to GENCO (rather than Crowley) notwithstanding GENCO's significantly higher TEP. In a footnote, GAO commented that "in evaluating competitive proposals, agencies are required to meaningfully consider the cost to the government," and that "to the extent the agency does not consider the [TEPs] here to be a reasonable assessment of the cost of performance, the agency should consider whether the solicitation's price evaluation methodology should be revised." Id.

First, the CO's statement suggesting that the TEPs did not reflect actual costs over the lifetime of the contract was a defensive point made in the context of litigation and was not a stated basis for awarding the contract to GENCO rather than Crowley. Further, and more significantly, USTRANSCOM did not, in fact, revise the price evaluation methodology after the first GAO decision. Given the fact that GAO instructed that the agency should revise the terms of the Solicitation if the TEP did not represent a reasonable assessment of cost, the agency's decision not to change the RFP shows that it intended its use of the TEP to be its reasonable assessment of cost for the second evaluation as well. Therefore, there was nothing misleading about the discussions between the agency and XPO because there was no change in the agency's method of evaluating price between its first and second evaluations.

For these reasons, XPO's motion for judgment on the administrative record in case number 17-452 with respect to Counts III and V of the complaint is **DENIED** and the government's and Crowley's cross-motions are **GRANTED**.

C.    **Alleged Flaws in the Agency's Evaluation of Non-Price Factors**

In Count IV of its complaint, XPO challenges the agency's conclusion that the benefits of XPO's proposal were insufficient to justify its higher TEP, claiming that the agency did not engage in a meaningful comparison of the offerors' past performance or technical capability. See Am. Compl. ¶¶ 90–100. XPO contends that "[t]he agency's best value determination was . . . fundamentally flawed because the SSA failed to consider the underlying merits of the proposals and, instead, based his trade-off solely on the adjectival ratings." XPO's Br. at 24; see also Am. Compl. ¶ 95 (asserting that the source selection decision "lack[ed] any substantive consideration . . . of Crowley's and XPO's proposals . . . [and] fail[ed] adequately to document the . . . decision").

To the extent that XPO challenges the agency's comparison of the past performance of Crowley and XPO, that challenge is moot. As part of the corrective action the Court has already found reasonable, the agency will be re-evaluating the performance risk presented by each offeror's proposal. There is no live controversy, therefore, regarding the merits of the agency's original performance assessments.

As noted, XPO also challenges the agency's comparison of the parties' technical proposals. It argues that the comparative assessment of the technical proposals was flawed because it was allegedly "almost exclusively based on top-level adjectival ratings" and also allegedly "whitewash[ed]" the differences in proposal merit that the agency identified. XPO's Br. at 29–30. This aspect of XPO's challenge is not moot because the agency will not revisit this comparative assessment as part of the corrective action, unless the Court directs it to do so. The challenge, however, lacks merit.

FAR 15.308 provides that the SSA's "decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation." He or she may "use reports and analyses prepared by others," but the decision must "represent the SSA's independent judgment." FAR 15.308. This comparative assessment requires "consideration not only [of] the proposals' adjectival ratings but also information on advantages and disadvantages of the proposals," and the agency is required to "[l]ook[] beyond the adjectival ratings . . . because proposals with the same adjectival ratings are not necessarily of equal quality." Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 553 (2013) (quotation and citation omitted).

In this case, an examination of the administrative record reveals that the agency and the SSA clearly considered more than the adjectival ratings in comparing the proposals. First, the agency engaged in an analysis of the specific strengths of each offeror's technical proposal as relevant to the evaluation subfactors. AR Tab 117 at 12385–88. For instance, the agency noted that Crowley's proposal to use "[***]." Id. at 12385. Similarly, it noted a strength in XPO's proposal to use a claims processing system known as "ONE TMS," because it would allow XPO to "exceed[] the Government's requirement of processing claims in less than 180 days." Id. at 12388.

Second, the SSEB engaged in a detailed comparative discussion of the various strengths of each proposal with respect to each subfactor. Id. at 12391–95. These comparisons were based on more than a tallying of the number of strengths or a comparison of the adjectival ratings received for each subfactor; they included an analysis of why particular aspects of the proposals warranted designation as a strength and why one proposal was more favorable than the other with respect to that subfactor. E.g., id. at 12391 (SSEB report assigning a strength to XPO for subfactor one for its "proposed 24/7 technical support" because "it allow[ed] the Government the potential for faster response to unforeseen systems issues").

To be sure, the SSEB concluded with respect to subfactors one and four that "there [was] no discernable difference in the proposed technical approach and all Offerors [were] considered equal under [the] subfactor." Id. at 12392, 12395. But that conclusion does not suggest that the agency was somehow "artificial[ly] levelling" the parties' proposals, as XPO contends. XPO's Br. 30. Thus, the SSEB also concluded, with respect to subfactor two, that XPO's approach was "considered more favorable in that the Offeror provide[d] an implementation plan utilizing a

proven and reliable transportation management system that is currently in use by the Government and requires minimal revisions to conform to the DFTS requirement." Id. at 12393. It noted this "would require less training" and would provide "assurance of a tested and proven transportation management system." Id. With respect to subfactor three, the SSEB concluded that "Crowley's approach [was] considered more favorable" because it used "[***]." Id. at 12394.

Finally, both the SSAC and SSA adopted and used these discussions and comparisons. See id. Tab 118 at 12398, 12400–04; id. Tab 120 at 12442–45. The SSA noted in the source selection decision, for example, that "[b]oth Offerors provided a technical approach that was considered Good," but "[t]here [was] a discernible difference . . . in the proposed technical approaches." Id. Tab 120 at 12444. He stated that "[w]hile both Offerors' approaches contain multiple strengths with benefits, [XPO's] approach is considered more favorable" because it "provides an implementation plan utilizing a transportation management system that is currently in use," which would "require less training [for] several of the DFTS customers as well as assurance of a tested and proven transportation management system that connects with DoD shipper systems." Id.

Thus, XPO's argument that the SSA did not consider and compare the substance of the proposals has no merit. The SSA looked beyond the adjectival ratings and considered the advantages and disadvantages of the offerors' technical approaches. Therefore, because XPO's arguments all lack merit, XPO's motion for judgment with respect to Count IV in case number 17-452 is **DENIED** and the government's and Crowley's cross-motions are **GRANTED**.

## CONCLUSION

For the reasons set forth above, the government's motion to dismiss Crowley's complaint is **DENIED**. Crowley's motion for judgment on the administrative record in case number 17-455 is **DENIED,** and the government's and XPO's cross-motions are **GRANTED**. With respect to case number 17-452, XPO's motion for judgment on the administrative record is **DENIED**, and the government's and Crowley's cross-motions are **GRANTED**. The Clerk shall enter judgment accordingly. Each side shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge